Filed 3/14/13  In re J.W. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re J.W., a Person Coming Under the Juvenile Court Law. _____ LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>A.W.,<br><br>    Defendant and Appellant. | B241775<br><br>(Los Angeles County Super. Ct. No. CK91937) |

APPEAL from orders of the Superior Court of Los Angeles County,

Terry T. Truong, Juvenile Court Referee.  Affirmed.

Thomas S. Szakall, under appointment by the Court of Appeal, for Defendant

and Appellant.

John F. Krattli, Acting County Counsel, James M. Owens, Assistant County

Counsel, Jessica S. Mitchell, Associate County Counsel, for Plaintiff and Respondent.

A.W. (mother) appeals jurisdictional findings and dispositional orders entered with respect to her now 13-year-old son, J.W. Mother contends the jurisdictional finding and the order removing J.W. from her care are not supported by substantial evidence. We reject these claims and affirm the orders of the juvenile court.

## FACTS AND PROCEDURAL BACKGROUND

1. *Referral and detention.*

On November 28, 2011, the Department of Children and Family Services (the Department) received a referral indicating J.W. frequently was absent from school and had not attended for some time. After mother told the referring party she could not physically drag J.W. to school, the referring party made a home visit to ask J.W. why he did not attend school. J.W. made no eye contact during the interview and "just moaned while sitting in a chair." The home was unsanitary, cluttered and smelled of pet urine. Mother appeared to be under the influence during the home visit. Mother stated maternal grandmother is an alcoholic who emotionally abuses J.W. by calling him names. Mother and maternal grandmother "constantly argue" and mother admitted J.W. might not want to attend school in order to stay home to protect mother.

On December 6, 2011, a social worker interviewed J.W. at school. J.W. indicated he had been "sick for a long time and had to stay at home." However, J.W. was unable to identify his illness, shrugged when the social worker asked what made him ill and indicated he did not see a doctor for the illness. J.W. indicated he went to Hawaii with mother for a while but did not respond when the social worker asked about making up school assignments. J.W. denied emotional abuse by mother, denied criminal activity or substance abuse in the home and denied that mother acted sad or "weird." However, J.W. admitted maternal grandmother called him names when she was drunk and he feels the need to protect mother from maternal grandmother. J.W. indicated maternal grandmother drank every day of the week, except Wednesday when she works a double shift. The social worker noted J.W. failed to make eye contact and was visibly depressed as he disclosed his concerns about the home.

Also on December 6, 2011, J.W.'s academic counselor told the social worker J.W. had been absent for more than 30 days. Although the counselor left messages for mother inquiring about J.W., mother did not respond. The counselor and campus aide Saenz visited the home and found it unsanitary. Mother appeared to be under the influence, failed to maintain eye contact, continuously played with her hair and giggled inappropriately. Mother told the counselor maternal grandmother is an alcoholic who constantly intimidates J.W. and is verbally abusive to the child. Mother was evasive about the child's absences and stated she assumed J.W. wanted to stay home to protect mother from maternal grandmother's verbal abuse.

Campus aide Saenz told the social worker he observed J.W. "grunting throughout the visit." J.W. also rocked and looked to the ground when asked about school attendance. Saenz had never seen J.W. demonstrate such behavior at school.

The detention report indicated mother had been arrested on July 22, 2011, for possession of a controlled substance and being under the influence of a controlled substance. The police report indicated mother's vehicle was stopped because a passenger had been involved in a petty theft. When officers stopped the car, the suspect no longer was in the vehicle but mother appeared to be under the influence and the officers found methamphetamine in mother's wallet. Mother refused to drug test but wrote a statement in which she admitted she had smoked methamphetamine a few hours earlier, she was "new at smoking" methamphetamine and she wanted to stop. Mother wrote, "I accidentally left a small baggie of methamphetamine inside my wallet which was inside my purse." Mother's female passenger also was under the influence and in possession of methamphetamine. On August 17, 2011, mother resolved the criminal case by entering a deferred entry of judgment program.

The social worker was not able to interview mother until January 6, 2012. The social worker found the home cluttered and malodorous. "The carpet appeared to be urine soaked and extremely dirty." Mother indicated J.W. missed a week of school due to the flu and, when he got better, he did not want to return and mother could not force him to attend. Mother admitted maternal grandmother called J.W. names, such as fat,

3

lazy and stupid. Mother protected J.W. by standing between maternal grandmother and J.W. or by locking themselves in a bedroom or going to a motel when maternal grandmother was out of control. Mother indicated maternal grandmother usually got drunk 5 to 7 days a week and only refrained from drinking on Wednesdays. Mother indicated she was unemployed and was financially compelled to live with maternal grandmother. During the interview, mother played with her hair, smiled inappropriately and appeared nonchalant concerning the condition of the home. Mother agreed to drug test but stated she could not test that day because she had to attend a funeral. Mother stated the whereabouts of J.W.'s father were unknown.

In an interview conducted February 1, 2012, maternal grandmother admitted she did not get along with mother, yelled at J.W. and drank alcohol but denied drinking to intoxication. Maternal grandmother indicated J.W. had resided with her since a young age and she yells at him when he does not complete his chores. Maternal grandmother believed mother was using methamphetamine with her boyfriend and is "too high" to attend to J.W.

On February 7, 2012, at a team decision-making meeting attended by mother, maternal grandmother, maternal uncle and several social workers, mother denied that she had used drugs more than once. Maternal grandmother reiterated her belief mother uses methamphetamine with her new boyfriend. Maternal uncle indicated he believed mother had been using drugs for several months. At the conclusion of the meeting, mother consented to placement of J.W. with maternal uncle and stated she would enroll in a residential treatment program.

On February 21, 2012, the Department filed a dependency petition alleging J.W. was at substantial risk of harm due to mother's history of illicit drug use, her current use of methamphetamine, the filthy condition of mother's home and maternal grandmother's access to the child. At the detention hearing, the juvenile court ordered J.W. to remain with maternal uncle and ordered the Department to provide mother referrals for an approved drug rehabilitation program and ordered mother to drug test on a weekly basis and to participate in individual counseling.

4

2. *Jurisdiction report.*

When interviewed for the jurisdiction report, J.W. stated he never saw mother drink or smoke anything that caused her to act differently, he felt safe in mother's care and he wanted to be returned to mother.

Mother claimed she "literally" used methamphetamine only once about a year ago when she was arrested. Mother stated the police lied about finding drugs in mother's possession and claimed the officers dictated the statement mother wrote.

Maternal uncle stated mother used drugs "in the late 1980's and early 1990's" and admitted to him in 2011 she again was "dabbling" in methamphetamine. Maternal uncle reported mother's current boyfriend is a "drug user" and, after mother recently started using drugs again, she lost her job, her car and now has lost her son. Maternal uncle opined mother's drug diversion program was not working, as mother "continues to use."

An interim review report filed May 9, 2012, detailed the difficulty the Department had encountered in maintaining contact with mother and indicated mother failed to submit to on-demand tests on the day of the initial interview, and on two other occasions. A multidisciplinary assessment of J.W. indicated mother was not cooperative and did not return the evaluator's phone calls. The Department indicated mother had not been compliant with J.W.'s case plan and failed to maintain regular contact with the Department.

3. *Adjudication and disposition.*

On May 9, 2012, the social worker testified mother tested negative on April 9, 2012, but failed to test on April 19, and May 2, 2012, after messages were left at the phone number mother had provided. The social worker was concerned mother currently was using drugs based on mother's failure to maintain contact with the Department and the missed tests. The only time mother contacted the Department after the initial interview was to leave a new cell phone number. The social worker was not certain what was "going on" with mother but was concerned.

Mother testified she last used drugs about a year ago. Mother denied smoking methamphetamine or refusing to drug test on the day of her arrest in June of 2011, and denied that drugs were found in her purse. Mother entered a plea in that case on advice of counsel and was placed on probation with a 20-week drug diversion program which mother had completed. Mother denied she ever had a drug problem.

Regarding the arrest in June of 2011, mother testified the police found drugs and drug paraphernalia in the possession of mother's friend but not mother. Mother no longer lives with maternal grandmother and has no plans to return to her home. Mother enrolled in a parenting class at the end of March 2012 and has attended several sessions. Mother visited J.W. once since the last court date, citing the distance involved. Mother currently was staying with friends and was "technically" homeless. Mother did not receive the letters regarding drug testing sent to her by the Department and does not have a telephone. Mother is not currently enrolled in any drug program.

Counsel for the Department asked the juvenile court to sustain the petition, citing mother's admission in the police report of July 22, 2011, that she used methamphetamine. J.W.'s counsel argued there was no proof mother currently was using drugs or that J.W. was at risk in mother's care. Mother's counsel asserted there was no current risk to J.W., noting mother completed a diversion program, there was no evidence mother currently uses drugs and mother had moved from maternal grandmother' home.

The juvenile court struck the allegation mother is a current user of methamphetamine but sustained counts b-1 and b-3 as amended and declared J.W. a dependent within the meaning of Welfare and Institutions Code section 300, subdivision (b).[1] Count b-1 alleged mother's history of illicit drug use renders mother incapable of providing regular care and supervision and places J.W. at risk of harm. Count b-3 alleged mother established an endangering home environment by allowing

---

[1] Subsequent unspecified statutory references are to the Welfare and Institutions Code.

6

maternal grandmother, a current abuser of alcohol who frequently is under the influence of alcohol in the child's presence, to have unlimited access to the child.

The juvenile court rejected mother's assertion she did not write the statement attached to the police report and found mother was either under the influence of drugs when she wrote the statement "or she's lying to me today." The juvenile court noted "various individuals" in mother's life "suspect she uses [drugs]." The juvenile court questioned why mother was not drug testing and concluded there were insufficient test results to conclude mother was not using drugs.

The juvenile court found, by clear and convincing evidence, there was a substantial danger if J.W. were returned to mother and there were no reasonable means by which to protect the child absent removal. The juvenile court ordered the Department to provide mother family reunification services, including random drug testing, individual counseling and conjoint counseling if recommended by J.W.'s therapist. The juvenile court granted mother unmonitored visitation if mother consistently was testing negative. Due to mother's telephone situation, the juvenile court ordered mother to test randomly by calling the testing facility daily. The juvenile court ordered the Department to provide mother housing and transportation assistance.

## CONTENTIONS

Mother contends the jurisdictional findings are not supported by substantial evidence and there were reasonable means available to protect J.W. without removing him from mother's custody.

## DISCUSSION

1. *The jurisdictional findings are supported by substantial evidence*.

    a. *Standard of review*.

At a jurisdictional hearing, the juvenile court determines by a preponderance of the evidence whether the child named in the petition falls within any of the categories specified in section 300. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248; *In re Michael D.* (1996) 51 Cal.App.4th 1074, 1082; § 355, subd. (a).) Section 300, subdivision (b) permits dependency jurisdiction, as relevant here, when "[t]he child has

7

suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or by the willful or negligent failure of the child's parent or guardian . . . to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's . . . substance abuse."  (§ 300, subd. (b).)

To find jurisdiction under section 300, the juvenile court must determine whether circumstances at the time of the hearing subject the child to the defined risk of harm. (*In re Adam D.* (2010) 183 Cal.App.4th 1250, 1261; *In re Janet T.* (2001) 93 Cal.App.4th 377, 388.)  Evidence of past events may have a probative value in finding jurisdiction, but only if circumstances existing at the time of the hearing make it likely the child in the future will suffer the same type of serious physical harm or illness as alleged in the petition.  (*In re Janet T., supra,* at p. 388.)

In reviewing a juvenile court's jurisdictional finding, we apply the substantial evidence test.  (*In re David M.* (2005) 134 Cal.App.4th 822, 828.)

b.  *Count b-1.*

Mother contends her history of drug abuse did not pose a risk of serious physical harm to J.W.  Mother notes her arrest on July 22, 2011, preceded the adjudication by nine months and there was no evidence mother used any illicit substance after that incident. Further, in light of the juvenile court's finding there was no evidence mother currently was using drugs, there was no evidence of any current risk of harm.  Mother notes J.W. told the social worker he was not aware of any drug use or strange behavior by mother, no drugs were found in mother's home and mother never tested positive.

Mother concludes there was no nexus between mother's drug history and any future risk to J.W.  (*In re J.O.* (2009) 178 Cal.App.4th 139,152.)  "Perceptions of risk, rather than actual evidence of risk, do not suffice as substantial evidence." (*In re James R.* (2009) 176 Cal.App.4th 129, 137  Thus, the finding J.W. was at risk of serious physical harm due to mother's history of drug use constituted speculation.

8

Mother additionally claims the record indicates mother's difficulty in communicating with the Department with respect to drug testing was due to poverty, specifically, the lack of a cell phone. Mother testified she relied on borrowed cell phones to maintain contact with the Department. Mother claims the Department repeatedly failed to arrange for mother's drug tests and mother appeared for drug tests only due to her own efforts in contacting the test facility. Thus, the finding mother failed to drug test was not based on specific evidence showing future risk.

Mother's arguments are not persuasive. The evidence showed mother admitted to maternal uncle that she had a history of drug abuse in the 1980's and 1990's and she again began "dabbling" in drugs, including methamphetamine, in 2011. Maternal uncle told the social worker that, after mother commenced drug abuse in 2011, mother lost her car and her job. Also, mother was arrested for possession of methamphetamine on July 22, 2011, and maternal grandmother repeatedly reported mother used methamphetamine with her new boyfriend and neglected J.W.

Additionally, J.W.'s school counselor and the campus aide who went to mother's home both indicated mother appeared to be under the influence during the visit. Similarly, during the initial interview, the social worker thought mother was under the influence. Mother's neglect of J.W. was evident in that he missed more than a month of school and his home was filthy. Although mother claimed J.W. had been ill, he did not see a doctor and he avoided school to protect mother from maternal grandmother.

Based on this record, the juvenile court reasonably could conclude mother's neglect of J.W. was attributable to mother's drug use and that mother's substance abuse continued to place J.W. at risk of harm.

With respect to drug testing, the juvenile court ordered mother to drug test weekly at the detention hearing. In spite of this order, mother failed to drug test regularly and failed to maintain contact with the Department. Mother blames her failure to test on her poverty which prevented her from having access to a cell phone. However, given that mother recently had completed a drug diversion program, the juvenile court reasonably

9

could conclude mother was aware of drug testing protocol and that she orchestrated the Department's inability to contact her in order to avoid drug testing.

In sum, the finding that mother's history of drug abuse posed a risk of serious physical harm to J.W. is supported by the record.

c. *Count b-3.*

Mother contends the finding mother "established a detrimental and an endangering home environment" by allowing maternal grandmother access to J.W. did not support jurisdiction under section 300, subdivision (b). Mother contends maternal grandmother's verbal and emotional abuse of J.W. is not jurisdictional. (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 715.) Further, mother no longer resided in maternal grandmother's home. Thus, the jurisdictional finding in b-3 must be reversed.

Given that count b-1 is supported by substantial evidence, we need not address mother's contention with respect to count b-3. When a dependency petition alleges multiple grounds for asserting jurisdiction, a reviewing court can affirm the finding of jurisdiction if any one of the statutory bases for jurisdiction enumerated in the petition is supported by substantial evidence. (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1492; *D.M. v. Superior Court* (2009) 173 Cal.App.4th 1117, 1127; *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451; *In re Shelley J.* (1998) 68 Cal.App.4th 322, 330 [declining to address remaining allegations after one allegation found supported]; *Randi R. v. Superior Court* (1998) 64 Cal.App.4th 67, 72; *In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875.) However, the evidence also supports count b-3.

Mother contends count b-3 alleged no more than emotional abuse, which is not jurisdictional. However, the record permitted the juvenile court to conclude maternal grandmother not only called J.W. names, but also threatened physical harm to the child in that mother had to intervene to protect J.W. from maternal grandmother either by standing between them or by taking J.W. to a locked bedroom or a motel. The risk of a physical confrontation during one of maternal grandmother's drunken rages was sufficient to warrant the conclusion J.W. was at risk of harm due to mother's failure to

protect him from maternal grandmother. Thus, jurisdiction also was proper under count b-3.

2. *The order removing J.W. from mother's custody is supported by substantial evidence.*

The standard for removal of a child from parental custody is found in section 361, subdivision (c) which provides, in relevant part, "A dependent child may not be taken from the physical custody of [a parent] with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence . . . [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody." (§ 361, subd. (c).)

"The parent need not be dangerous and the child need not have been actually harmed for removal to be appropriate. The focus of the statute is on averting harm to the child. [Citations.] In this regard, the court may consider the parent's past conduct as well as present circumstances. [Citation.]" (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.) Although the juvenile court's findings must be based on clear and convincing evidence, we review an order removing a child from parental custody for substantial evidence. (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433; *In re Henry V.* (2004) 119 Cal.App.4th 522, 529.)

Mother contends that, at the time of the disposition, she no longer resided with maternal grandmother, thereby eliminating the risk of verbal abuse by maternal grandmother. She also claims homelessness is an insufficient basis upon which to remove a child from parental custody. (*In re G.S.R.* (2008) 159 Cal.App.4th 1202, 1210.) Mother claims the juvenile court should have ordered the Department to assist mother to obtain housing.

11

However, J.W. was not removed from mother's care due to mother's homelessness. Rather, mother's drug abuse caused her to neglect J.W. and exposed J.W. to maternal grandmother's alcoholism and verbal abuse. J.W. missed 30 days of school, was not provided medical care when he had a flu that lasted a week and he lived in a filthy home environment. Mother denied drug abuse and failed to appreciate the neglect to which J.W. had been exposed. Mother does not assert what reasonable alternative the juvenile court might have employed in this case to avoid removal from mother's care other than to assert the juvenile court should have ordered the Department to provide mother housing assistance. Given that mother failed to maintain contact with the Department, it is unlikely such an order would have had an impact on the situation. In any event, the juvenile court did order the Department to assist mother with housing.

## DISPOSITION

The orders under review are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KLEIN, P. J.

We concur:

KITCHING, J.

ALDRICH, J.

12